Erick C. Howard (Bar #214107)
ehoward@sflaw.com
SHARTSIS FRIESE LLP
One Maritime Plaza, Eighteenth Floor
San Francisco, CA 94111
Telephone: (415) 421-6500
Facsimile: (415) 421-2922

Richard B. Walsh, Jr.
rwalsh@lewisrice.com
Michael J. Hickey
mhickey@lewisrice.com
Sarah A. Milunski
smilunski@lewisrice.com
Michael H. Durbin
mdurbin@lewisrice.com
LEWIS RICE LLC
600 Washington Avenue, Suite 2500
St. Louis, MO 63101
Telephone: (314) 444-7600
Facsimile: (314) 241-6056

Attorneys for Defendant
SRAM, LLC

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOX FACTORY, INC., | Case No. 3:16-CV-03716-WHO |
| Plaintiff, | **DEFENDANT SRAM, LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| SRAM, LLC, | Tutorial Date: September 22, 2017 |
| Defendant. | Hearing Date: September 29, 2017 |
| | Time: 9:00 a.m. |
| | Courtroom: 2, 17th Floor |
| | Judge: Hon. William H. Orrick |

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 4

II.     BACKGROUND ................................................................................................... 5

III.    PRINCIPLES OF CLAIM CONSTRUCTION ..................................................... 7

IV.     ARGUMENT ........................................................................................................ 8

        A.      "*axle*" .................................................................................................. 8

        B.      "*first end*" / "*second end*" ........................................................ 11

        C.      "*cam assembly*" ............................................................................. 14

        D.      "*operatively connected ...*" ......................................................... 17

        E.      "*substantial portion of said lever*" ............................................. 19

        F.      "*substantially unimpeded by an adjacent part of said vehicle*" / "*does not substantially interfere with said adjacent vehicle component when said axle is rotated*" ...................................... 23

V.      CONCLUSION ................................................................................................... 25

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

- ii -

1

## TABLE OF AUTHORITIES

2

**Cases**

3
*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006) ........................................ 24

4
*Computer Docking Station Corp. v. Dell, Inc*., 519 F.3d 1366 (Fed. Cir. 2008) ......................... 22

5
*Cormack v. United States*, 119 Fed. Cl. 63 (Fed. Cl. 2014) .................................................. 12, 16

6
*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc., Inc.*, 347 F.3d 1314
  (Fed. Cir. 2003) ................................................................................................ 22, 23

7

8
*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022 (Fed. Cir. 2002) ............... 20

*Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014) ...................... 7, 8, 14, 20

9

10
*Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312 (Fed. Cir. 2016) ............................ 7

*In re Wertheim*, 541 F.2d 257 (CCPA 1976) .......................................................................... 13

11

12
*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517
  U.S. 370 (1996) ......................................................................................................... 7

13
*Pall Corp. v. Hemasure, Inc.*, 181 F.3d 1305 (Fed. Cir. 1999) .......................................... 12, 22

14
*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) .............................. 4, 7, 8, 11

15
*Poly–America, L.P. v. API Indus., Inc.*, 839 F.3d 1131 (Fed. Cir. 2016) ................................ 7, 8

16
*Power Mosfet Techs., L.L.C. v. Siemens* AG, 378 F. 3d 1396 (Fed. Cir. 2004) ......................... 13

17
*Source Vagabond Systems Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291 (Fed. Cir. 2014) ............ 12, 16

18
*White v. Dunbar*, 119 U.S. 47 (1886) ..................................................................................... 4

19

20

21

22

23

24

25

26

27

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

## I.      **INTRODUCTION**

Although SRAM makes the same points in the introduction of its parallel claim construction brief in Case No. 3:16-CV-00506-WHO because FOX engages in the same improper attempts to add structure and limitations to its claims, it bears repeating that the purpose of claim construction is to determine the true meaning and scope of asserted patent claims – it is not intended to rewrite claims to mean something different from their ordinary meaning.  The Supreme Court warned against this very tactic more than 130 years ago:

> Some persons seem to suppose that a claim in a patent is like a nose of wax, which may be turned and twisted in any direction, by merely referring to the specification, so as to make it include something more than, or something different from, what its words express.  ***The context may undoubtedly be resorted to, and often is resorted to, for the purpose of better understanding the meaning of the claim, but not for the purpose of changing it and making it different from what it is.***  The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is, and ***it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.***

*White v. Dunbar*, 119 U.S. 47, 51 (1886) (emphasis added).  Patents are not working drafts, subject to revision through claim construction.  Rather, patents are contracts with the government and put the public on notice as to the specific metes and bounds of the property rights contained therein.  Claim construction is an interpretation of that contract and is not a blue pencil exercise.

Here, as in the shock absorber case, FOX pays lip service to the well-established law that "[t]he words of a claim 'are generally given their ordinary and customary meaning' … [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  FOX's Brief at 8–9 (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc)).  FOX also parrots the well-established law that a court must "avoid the danger of reading limitations from the specification into the claim."  *Id.* at 9 (citing *Phillips*, 415 F.3d at 1323).  However, FOX then flouts this law by repeatedly importing limitations from the specification and disregarding the ordinary and customary meaning of the claim terms in dispute for U.S. Patent Nos. 8,226,172 ("the '172 patent") and 8,974,009 ("the '009 patent").

Each of the disputed phrases has an ordinary and customary meaning to one of ordinary skill in the art.  SRAM's proposed constructions are consistent with those ordinary meanings, the

'172 and '009 patents, their file histories, as well as relevant dictionary definitions, testimony of various named inventors of the patents, and SRAM's own technical expert.  Accordingly, SRAM respectfully requests that this Court reject FOX's attempts to rewrite the claims of the '172 and '009 patents and instead adopt SRAM's plain meaning constructions of the disputed claim terms.

## II.      BACKGROUND

FOX spends much of its brief touting the purportedly unique and special aspects of its axle design, particularly for bicycles.  However, it is the claim language that defines the invention, not FOX's multiple statements about what it perceives as the advantages of particular embodiments over the prior art.

For example, the vast majority of the '172 and '009 patent are not limited to bicycles or bicycle suspension forks or even suspension forks.  Instead, the claims are directed to an axle for a "vehicle" with a wheel.  The Title of the patents reflect this:  "METHODS AND APPARATUS FOR RELEASABLY SUPPORTING A VEHICLE WHEEL ASSEMBLY" and the Field of the patents is described broadly:  "Embodiments of the present technology relate generally to the field of wheeled vehicles."  Ex. 1, '172 patent, col. 1, lines 1–3, 20–23.[1]  Even the Description of the Embodiments section is not limited to bicycles as FOX's Brief would suggest:  "[e]mbodiments of the present technology generally relate to methods and apparatuses for retaining a vehicle hub and wheel, for example a vehicle hub and wheel of a two-wheeled and/or man-powered vehicle such as a bicycle."  Id., col. 3, lines 44–47.

FOX also misleadingly focuses on conflated advantages of its "patented design" that are not limitations of the actual claim language.  FOX touts that its axle "is sturdier than quick release hub skewers" and "can also be quickly installed and removed with one hand," FOX's Brief at 3–4, even though the claim language says nothing about sturdiness, time for installation and removal of the axle, or the one-handedness of such installation and removal.  Likewise, FOX hypes that its axle shaft has "no slots or wedges," "does not crack with repeated use," and "there are no wedges

---

[1] The '172 and '009 patents share the same specification with the exception of the cross-reference to related applications at the beginning of the specification and the claims at the end of the specification.  For convenience and as appropriate, SRAM provides citations to the '172 patent specification only but those should be understood to apply to parallel portions of the '009 patent.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

to get stuck."  FOX's Brief at 6.  Such features are not required by the patent claims and are irrelevant to the claim construction issues before the Court.

Finally, FOX states that its invention includes a "lever stop" that "limits the lever's maximum angle of rotation," thereby enabling quick installation and removal of the axle.  FOX's Brief at 7.  What FOX omits as part of this Background is that, despite its years of experience selling products for vehicles, including cars, trucks, snowmobiles, motorcycles, bicycles, and various off-road vehicles, FOX did not submit to the Patent Office the most relevant prior art reference, namely, SRAM's Maxle 360 / Rear Maxle axle shown below:

**APPENDIX A**
**SRAM'S INITIAL INVALIDITY CONTENTIONS**

Anticipation of Claims 1, 2, 4, 6, and 7 of U.S. Patent No. 8,226,172 under 35 U.S.C. § 102:
*SRAM's Maxle 360 / Rear Maxle*

| | Claim 1 of the '172 patent | *SRAM's Maxle 360 / Rear Maxle* |
|---|---|---|
| 1.6 | and a lever stop ensuring that an angle of maximum rotation for said lever from said closed position is less than 180 degrees. | The Maxle has a lever stop ensuring that an angle of maximum rotation for said lever from said closed position is less than 180 degrees. |

FOX Brief Ex. H at p. 7.  SRAM's Maxle 360, sold for use with bicycle suspension forks years before FOX's patent filings, has all of the required elements of the asserted claims of the '172 and '009 patents, as properly construed.  Although the validity of the '172 and '009 patents is a question separate from claim construction, it is necessary to raise here to show FOX's true motives for its tortured claim constructions, namely to rewrite the claims to avoid this prior art.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9 4111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

### III.   PRINCIPLES OF CLAIM CONSTRUCTION

Claim construction is an issue of law and is intended to "determin[e] the meaning and scope of the patent claims asserted to be infringed." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370, 372 (1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (citation omitted). "[T]he words of a claim 'are generally given their ordinary and customary meaning' . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13. "[A] skilled artisan reads a claim term not only in the context of the claim at issue, but also in the context of the entire patent, including the written description and prosecution history, as well as relevant extrinsic evidence." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1320–21 (Fed. Cir. 2016).

The Federal Circuit has stated that it will "depart from the plain and ordinary meaning of claim terms based on the specification in only two instances: lexicography and disavowal." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). "The standards for finding lexicography and disavowal are exacting." *Id.* "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term." *Id.* (internal quotations omitted). A disavowal must be both clear and unequivocal, but need not be explicit. *See Poly–America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016). "[A]n inventor may disavow claims lacking a particular feature when the specification describes 'the present invention' as having that feature." *Id.* "Similarly, an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature." *Id.*

Likewise, while the prosecution history "lacks the clarity of the specification and thus is less useful for claim construction purposes," it still provides evidence of how the inventor intended the term to be construed. *See Phillips*, 415 F.3d at 1317. If necessary, courts may also use extrinsic evidence (*e.g.,* expert testimony, inventor testimony, treatises, dictionaries) to resolve the scope

and meaning of a claim term, so long as that extrinsic evidence "does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322–23.

## IV.   ARGUMENT

### A.   "*axle*"

| Claim Term | SRAM's Construction | FOX's Construction |
|:---:|:---:|:---:|
| "axle" | "cylindrical component around which a wheel rotates" | "a cylinder upon which a wheel hub rotates" |

The crux of the parties' dispute is whether the term "axle" as used in the '172 and '009 patents is a cylindrical component "around" which a wheel rotates or "upon" which a wheel hub rotates.  By requiring that the wheel hub rotate "upon" the cylinder, FOX's construction seeks to define the axle as "a shaft that supports a wheel hub" (FOX's Brief at 10) and disregards the difference between the axle as a whole and the axle shaft, which the '172 and '009 patents specifically distinguish.   Further, FOX's proposed construction improperly eliminates the possibility of any intervening parts between the axle and the wheel or wheel hub, in contravention of the plain meaning as understood by one of ordinary skill in the art.  Not all vehicle axles directly contact the wheel hub, as implied (and would be required) by FOX's construction.  In contrast, SRAM's proposed construction comports with the ordinary and customary meaning of the term "axle," as understood by one of ordinary skill in the art in the context of the patents.[2]

As acknowledged by FOX, the words of a claim are "generally given their ordinary and customary meaning," unless the inventor clearly expresses an intent to redefine the term or make a clear and unequivocal disavowal of claim scope.  *See Phillips*, 415 F.3d at 1312; *see also Poly-America*, 839 F.3d at 1136; *Hill-Rom Servs.*, 755 F.3d at 1371.  Neither exception is present here.

---

[2] The level of ordinary skill in the art is a person with at least an undergraduate degree in mechanical engineering with approximately five years of experience in design and manufacture of machine elements.  *See* Ex. 5, Sturges Decl. ¶ 10.  In this case, Dr. Robert Sturges easily meets these requirements, obtaining a Ph.D. in mechanical engineering from Carnegie Mellon University in 1986, and a combined B.S.–M.S. in Mechanical Engineering from the Massachusetts Institute of Technology in 1969, and having worked as an engineer for approximately fifteen (15) years, specializing in mechanical and electrical systems design as well as robotics design, including for the Apollo space program.  *See id.* ¶¶ 3–4 and attached CV.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

The term "axle" as used in the '172 and '009 patent claims comprises multiple elements: (1) a rotary-type connector; (2) a cam assembly; (3) a lever; and (4) a lever stop.  *See* Ex. 1, '172 patent, col. 16, lines 25–63; Ex. 2, '009 patent, col. 16, line 35 – col. 17, line 6.  Throughout the specification of the '172 and '009 patents,[3] the inventors refer generally to an "axle" as specifically distinguished from an "axle shaft".  *See, e.g.*, Ex. 1, '172 patent, col. 1, lines 47–56 (discussing motorcycle and bicycle axles); *id.*, col. 2, lines 24–52 (discussing the "axle" of US 2005/0110335, *i.e.*, the Rose application referred to in FOX's Brief); *id.*, col. 3, lines 4–6 (describing FIGS. 1A-1D are perspective views of a lower leg part of a front suspension fork comprising a first embodiment of an "axle"); *id.*, col. 3, lines 12–13 (describing FIG. 3C as showing a longitudinal cross-section through "a shaft of the axle" of FIGS. 3A and 3B); *id.*, col. 4, lines 16–51 (describing various embodiments of an "axle" or "axle assembly" as comprising a rotary-type connector, a cam assembly, a lever, and a lever stop); *id.*, col. 9, line 55 – col. 11, line 16 (repeatedly distinguishing between axle assembly 2 and axle shaft 13).  Figures 1–11 of the '172 and '009 patents likewise distinguish between the axle assembly 2 and axle shaft 13.[4]  In other words, as depicted, described, and claimed in the '172 and '009 patents, the "axle" is not limited to the axle shaft.  FOX states in its brief that the axle is "a shaft" (p. 10) and implies this in its proposed construction by requiring the wheel hub rotate "upon" the cylinder.  Nothing in the file histories of the '172 and '009 patents provides a different understanding of the general term "axle."  *See* Ex. 3, '172 patent file history; Ex. 4, '009 patent file history.  Accordingly, one of ordinary skill in the art at the time of the invention would understand it to be the part "around" which the wheel rotates.  *See* Ex. 5, Sturges Decl. ¶ 12.

Moreover, one of ordinary skill in the art would recognize that FOX's proposed construction is flawed in light of the context of the '172 and '009 patents, given the proposed

---

[3] The '172 and '009 patents share the same specification with the exception of the cross-reference to related applications at the beginning of the specification and the claims at the end of the specification.  For convenience and as appropriate, SRAM provides citations to the '172 patent specification only but those should be understood to apply to parallel portions of the '009 patent.

[4] Similarly, the Rose application (which the '172 and '009 patents incorporate by reference) refers to an axle assembly 10 in contrast to a "tubular body 12" which is depicted as an axle shaft.  *See* FOX Brief Ex. C, col. 2, lines 55–65.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

limitation that the wheel hub rotate "upon" the axle with no possibility of intervening parts. The claimed invention is an "axle for removably retaining a wheel on a vehicle" and is not limited to bicycles. *See* Ex. 1, '172 patent, col. 16, lines 25–63; Ex. 2, '009 patent, col. 16, line 35 – col. 17, line 6. One of skill in the art would recognize that direct contact between the axle and the wheel (or wheel hub) is not required, simply as a matter of mechanical engineering. Oftentimes, vehicle wheel bearings (entirely separate from both the wheel hub and the axle) ride on an axle shaft and fit tightly inside the wheel hub. An example of such a vehicle wheel bearing is shown below:



Ex. 5, Sturges Decl. ¶ 13. One of ordinary skill in the art would thus recognize that a wheel or wheel hub need not rest directly "upon" the axle shaft, as would be required under FOX's overly narrow construction, but instead the wheel simply rotates "around" the axle. *See id.* ¶ 16. FOX cites to no evidence from one of ordinary skill in the art to contravene this understanding.

FOX argues that the term "axle" should not be construed to capture the Rose skewer system, effectively arguing that the inventors disclaimed a quick release skewer system like that shown in the Rose application based on their critique of certain portions of Rose. *See* FOX's Brief at 10–12. No such disclaimer occurred with respect to the term "axle." *See, e.g., id.* ¶¶ 14–15. The inventors of the '172 and '009 patents expressly described Rose as having an "axle," "axle assembly," and "axle body." *See, e.g.,* Ex. 1, '172 patent, col. 2, lines 24–52. The inventors admittedly critique certain slots in the Rose axle body and stress risers but do not disclaim the Rose skewer system as a whole. In fact, the '172 and '009 patent specifications ***expressly contemplate*** the use of a cam skewer as shown in the issued Rose patent (U.S. Patent No. 7,090,308, FOX Brief Ex. C), as well as other prior art patents:

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 94111

> Alternatively, the end **15** of the cam follower shaft may enclose a non-cam portion of the cam shaft **12** while cam surfaces external of the cam housing **4** interact with exterior surfaces of the cam housing **4** to effect the same movement. An example of such a cam skewer is shown in FIG. 1 of U.S. Pat. No. 7,090,308.
>
> ***
>
> In one embodiment the tooth form nut **5** and cam housing **4** described herein may also be adapted for use on a standard quick release skewer in conjunction with tooth form "lawyer lips" on the drop out of a bicycle fork or other vehicle fork. One skewer arrangement is shown in FIGS. **4A-4**D, and elsewhere in, U.S. Pat. No. 5,626,401 which patent is incorporated in its entirety herein by reference. Another skewer arrangement is shown in FIG. 1 of, and elsewhere in, U.S. Pat. No. 5,961,186 (the "'186 patent") which patent is incorporated in its entirety herein by reference. FIG. 1 of the '186 patent shows drop out lips **51** and nut **8** and flange **14**.

Ex. 1, '172 patent, col. 10, lines 60–65; *id.*, col. 16, lines 8–18.

Further, when the '172 and '009 patent specifications discuss a cam follower shaft (akin to a skewer), the specifications do not exclude all skewer designs, but only a subset of skewers seen as less than ideal. *See* Ex. 1, '172 patent, col. 10, lines 44–46. Moreover, this discussion is only with respect to "one embodiment" and cannot be used to import limitations into the claims. *See Phillips*, 415 F.3d at 1323. Additionally, this preference for a shorter cam follower shaft is not even claimed in the asserted claims of the '172 and '009 patents, as discussed further with respect to the construction of "cam assembly." *See* Ex. 5, Sturges Decl. ¶ 14.

For these reasons, the term "axle" should be construed in accordance with its ordinary and customary meaning, consistent with the intrinsic evidence and the testimony of one of ordinary skill in the art, as "cylindrical component ***around*** which a wheel rotates."

**B.**   "***first end***" / "***second end***"

| Claim Terms | SRAM's Construction | FOX's Construction |
|---|---|---|
| "first end" | No construction necessary | "first end of the axle" |
| "second end" | | "second end of the axle" |

1    Portions of the '172 and '009 patent claims are poorly worded – the goal of claim

2    construction is not to give patent owners a chance to correct inartful or indefinite claim language.

3    For example, claim 1 of the '009 patent refers to "a cam assembly operatively connected to the

4    second end" without providing an antecedent basis for that description.  Ex. 2, '009 patent, col. 16,

5    line 39.  SRAM believes that lack of antecedent basis is an invalidity problem for FOX and has

6    notified FOX of its position in this regard.  *See* FOX Brief Ex. I, at 15.  However, this invalidity

7    issue does not provide justification to FOX for using the same word it purports to define, and then

8    adding limitations to the word being defined, in contravention to established law.

9    Neither "first end" nor "second end" require construction as they appear in the '172 and

10   '009 patents.  The terms "first end" and "second end" are known and understood terms in the art,

11   referring to an "end" of an object, one being "first" referenced and the other being referenced

12   thereafter, or "second."  *See* Ex. 5, Sturges Decl. ¶ 17.  A person of ordinary skill in the art would

13   understand a "first" end to be a generic identifier for one of two or more terminus points on an

14   object which is referenced first (*i.e.*, before any other "end" is referenced).  *Id.* ¶¶ 17–18.  The

15   "first" end need not be any particular point on a given object, and again, every three-dimensional

16   object would have a "first end" once it is specified.  *Id.*  What is important is that the "first end,"

17   once set, will always refer to the same point.  *Id.* The same is true for a "second end"; it could be

18   any terminus point on an object.  There is no practical way to add "greater precision" to such terms

19   and so no construction should be applied.  *See Pall Corp. v. Hemasure Inc.*, 181 F.3d 1305, 1308

20   (Fed. Cir. 1999).

21   FOX argues, to the contrary and confusingly (presumably to preserve validity of the

22   claims), that the terms "first end" and "second end" should be defined by those terms themselves

23   ***plus*** three additional words: "of the axle."  It is generally improper to construe a term using the

24   original term and some additional language – this is not a construction because none of the words

25   of the term is defined.  *See, e.g.*, *Cormack v. United States*, 119 Fed. Cl. 63, 74 (Fed. Cl. 2014)

26   (rejecting proposed construction that added phrase "in the system" to further describe the claim

27   term being construed); *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed.

28   Cir. 2014) (rejecting proposed construction that added phrase "and the container" to the end of

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1   disputed claim term).  Apparently, FOX agrees that the specific words "first," "second," and "end"

2   do not require construction because FOX's proposed construction fails to define these terms.

3          Secondly, FOX's proposed construction would inappropriately render other claim

4   language superfluous, which is not preferred.  For example, using FOX's proposal, an element of

5   Claim 1 would read: "a lever operatively connected to said second end *of the axle of said axle* . .

6   . ."  Ex. 1, '172 patent, col. 16, lines 34–35 (emphasis added).  Likewise, claim 1 of the '009 patent

7   would read:  "a lever operatively connected to a second end of the axle of said axle . . . ."  Ex. 2,

8   '009 patent, col. 16, line 42.  There is no justification for interpreting one term of the claim in a

9   manner that renders other words in the claim superfluous.  *See Power Mosfet Techs., L.L.C. v.*

10  *Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004).

11         Moreover, FOX's claim construction arguments, at pages 13–15, are directed precisely at

12  SRAM's preliminary invalidity contentions (which is wholly improper) and are intended to give

13  antecedent basis that is otherwise lacking to indefinite claims.  The preceding indefinite article "a"

14  indicates that these elements are an antecedent basis in and of themselves – tellingly, the '172

15  patent does not claim "the first end" or "the second end" but instead "a" first end and "a" second

16  end, meaning that this is the first time that these elements are being referred to.  Ex. 1, '172 patent,

17  col. 16, lines 28–29.  In contrast, the '009 patent uses "the second end" followed by "a second end

18  of said axle," suggesting that two different "second ends" are contemplated.  *See* Ex. 2, '009 patent,

19  col. 16, lines 39, 42.  Further, the preamble generally does not limit the claims.  *See, e.g.*, *In re*

20  *Wertheim*, 541 F.2d 257, 270 (C.C.P.A. 1976).  Accordingly, FOX's reliance on the preamble and

21  attempt to add an antecedent basis to try to preserve validity by including the three superfluous

22  words "of the axle" is improper and should be rejected by the Court.[5]

23         Finally, FOX's attempt on page 14 of its brief to import embodiments in the specification

24  should not be allowed.  FOX cites to descriptions in the specification that apply only to "some

25  embodiments."  *See* Ex. 1, '172 patent, col. 4, lines 16–23.  The terms "first end" and "second

26

27  ───────────────
          [5] FOX asserts that "first end" and "second end" both derive antecedent basis from the
    recitation of "axle" in the preamble.  *See* FOX's Brief at 13, 14.  However, the preamble refers to
28  three separate objects: an axle, a wheel, and a vehicle, all of which could conceivably provide a
    basis for the references to "first end" and "second end."  *See* Ex. 5, Sturges Decl. ¶ 19.

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

end" cannot be limited to the disclosed embodiments unless the specification supplies an explicit definition or a clear disavowal of the larger scope of the term. *See, e.g.*, *Hill-Rom Servs.*, 755 F.3d at 1371. Here, the specification has no definition for the term "first end," implicit or explicit, especially because every object discussed in the specification will have a first end by virtue of being three-dimensional and necessarily having ends. *See* Ex. 5, Sturges Decl. ¶ 17–19. The specification also fails to disavow the plain and customary meaning of the term. Merely disclosing an embodiment in the specification, even if only a single embodiment is disclosed, is not sufficient grounds to narrow a claim term beyond the plain and customary meaning. *See, e.g.*, *Hill-Rom Servs.*, 755 F.3d at 1371. FOX's improper and superfluous constructions for "first end" and "second end" should be rejected. The terms require no construction.

## C. *"cam assembly"*

| Claim Term | SRAM's Construction | FOX's Construction |
|---|---|---|
| "cam assembly" | "collection of parts fitted or cooperating together to form a camming structure" | "cam assembly (including a cam and a cam follower shaft not extending the full length of the axle" |

FOX asserts, without evidence, that "cam assembly" does not have an ordinary and customary meaning in the art and instead improperly attempts to limit itself to a preferred embodiment from the '172 and '009 patent specifications. *See* FOX's Brief at 15. SRAM believes that "cam assembly" does have a plain meaning: "a collection of parts fitted or cooperating together to form a camming structure." Here, the dispute revolves around the word "assembly," and not "cam," at least because neither party's proposed construction defines the word "cam."[6]

The plain and customary meaning of "assembly" refers to a collection of parts that work or are connected together. *See* Ex. 5, Sturges Decl. at ¶ 20; *see also*, *e.g.*, Ex. 6, Declaration of Michael Durbin ("Durbin Decl."), attaching MCGRAW-HILL DICTIONARY OF MECHANICAL AND DESIGN ENGINEERING 21 (Sybil P. Parker ed., 3rd ed. 1984) (defining "assembly" as "A unit containing the component parts of a mechanism, machine, or similar device"); *id.*, attaching

---

[6] The term "cam" generally refers to a rotating or sliding part that can convert a rotational motion to linear motion, or vice versa. Ex. 5, Sturges Decl. ¶ 20.

MᴄGʀᴀᴡ-Hɪʟʟ Dɪᴄᴛɪᴏɴᴀʀʏ ᴏғ Sᴄɪᴇɴᴛɪғɪᴄ ᴀɴᴅ Tᴇᴄʜɴɪᴄᴀʟ Tᴇʀᴍs 139 (Sybil P. Parker ed., 5th ed. 1994) (defining "assembly" as "A unit containing the component parts of a mechanism, machine, or similar device"). Thus, a "cam assembly" must have a plain and customary meaning of a collection of parts connected together to perform a camming action. Ex. 5, Sturges Decl. ¶ 20. This assembly would include all of the parts that function together to cause the movement of the cam to translate rotational motion to linear motion, or vice versa. *Id.* SRAM's construction is consistent with this plain and ordinary meaning of the term.

SRAM's proposal is also consistent with the discussion of the camming structures in the specification of the '172 patent. In one embodiment discussed in the patents, the purpose of camming structures is to "cause[] the cam housing **4** to move either axially inward or outward relative to the shaft **13** . . . ." *See, e.g.*, Ex. 1, '172 patent, col. 10, lines 51–59. The cam translates the rotational movement of the lever **3** into linear movement of the housing **4** that is "either axially inward or outward relative to the shaft **13[**.]" *Id.* This movement translation is accomplished by a cam surface of the cam shaft **12**, by portions of the cam housing **4**, or by other, similar, camming structures. *Id.*, col. 10, lines 51–65. The specification broadly states these structures, even including any "cam surfaces external of the cam housing **4**" as a potential component of the mechanism that performs the camming action – "cause[] the cam housing **4** to move either axially inward or outward relative to the shaft **13** . . . ." *See, e.g., id.*, col. 10, lines 51–65. Structures such as the cam shaft **12**, the cam housing **4**, the lever **3**, and any "cam surfaces external of the cam housing **4**" may be constituents of the plain and customary meaning "cam assembly," depending on a given device's construction. The specification, as well as the plain and customary meaning of the term, indicates that "cam assembly" should be simply construed as "a collection of parts fitted or cooperating together to form a camming structure." Ex. 5, Sturges Decl. ¶ 20.

Other potential embodiments of the cam assembly are discussed in the '172 and '009 patent, including utilizing cam skewers like those shown in the prior art, such as U.S. Pat. No. 7,090,308 to Rose and others. *See* Ex. 1, '172 patent, col. 10, lines 60–65; *id.*, col. 16, lines 8–18. Notably, the referenced patents all disclose skewer arrangements where the cam skewer/follower shaft (highlighted in yellow) can extend the full length of the axle shaft (highlighted in pink):

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9  4111



FOX Brief Ex. C, Rose Patent, FIG. 2 (showing tubular body 12 and skewer 26); Ex. 7, U.S. Patent No. 5,961,186, FIG. 1 (showing hollow axle 30 and control rod 23); *see also* Ex. 8, U.S. Patent No. 5,626,401, col. 5, line 42 – col. 6, line 6 (disclosing that, by use of hollow axle 65 in combination with a camming mechanism, a conventional quick release lever with a skewer can be used, if desired); Ex. 5, Sturges Decl. ¶ 21.

FOX's proposed construction is improper on its face.  FOX's proposed construction merely repeats the phrase at issue, "cam assembly," and then adds sixteen words as a parenthetical: "cam assembly *(including a cam and a cam follower shaft not extending the full length of the axle)*" (emphasis added).  This cannot possibly be the plain and customary meaning of "cam assembly." *See, e.g.*, *Cormack*, 119 Fed. Cl. at 74   (rejecting a proposed construction that added "in the system" with nothing more to the claim language being construed); *Source Vagabond Sys. Ltd.*, 753 F.3d at 1299.  Because there is no such special definition nor any disavowal in the '172 patent specification, FOX's made-up parenthetical should be disregarded.

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Moreover, FOX's parenthetical explanation of the term (as opposed to construction of it) cannot be correct because it improperly limits this plain meaning phrase to one preferred embodiment shown in the specification, even though the '172 and '009 patents reference multiple other alternative cam assemblies, including assemblies that utilize cam follower shafts extending the full length of the axle shaft.  *See, e.g.*, Ex. 1, '172 patent, col. 10, lines 60–65; *id.*, col. 16, lines 8–18; *see also id.*, col. 16, lines 19–23 (explaining that while the written description "is directed to embodiments of the present invention, other and further embodiments of the invention may be implemented without departing from the scope of the invention, and the scope thereof is determined by the claims[.]"); *see also Phillips*, 415 F.3d at 1323.  FOX is wrongly seeking to add this limitation to avoid SRAM's own prior art Maxle 360 device, which has a skewer extending the full length of the axle shaft.  *See* Ex. H.

For these reasons, the Court should adopt SRAM's ordinary and customary meaning construction, consistent with the understanding of one of ordinary skill in the art.

**D.**     ***"operatively connected …"***

| **Claim Terms** | **SRAM's Construction** | **FOX's Construction** |
|---|---|---|
| "operatively connected to said second end"<br><br>"operatively connected to said second end of said axle"<br><br>"operatively connected to the second end"<br><br>"operatively connected to a second end of said axle" | "mechanically linked or put in contact with [the/a] second end [of said axle] in a working or effective manner" | "affixed to the second end portion of said axle so that opening and closing the lever moves the cam housing axially relative to the axle" |

With respect to the "operatively connected . . ." terms, FOX once again seeks to add limitations from a preferred embodiment in the specification (such as "affixed" and "cam housing" and "axial" movement) in order to avoid the ordinary and customary meaning of the term.  FOX does not dispute that "operatively connected" has an ordinary meaning – FOX wants to ignore it.

The ordinary and customary meaning of "operatively connected" is "mechanically linked or put in contact in a working or effective manner."  *See* Ex. 5, Sturges Decl. ¶ 22.  "Connect"

means join or fasten together, or put into contact.  *See id.*;  *see also* Ex. 6, Durbin Decl., attaching THE AMERICAN HERITAGE DICTIONARY 311 (2d coll. ed. 1991) (defining "connect" as "To join or fasten together; link; unite");  *id.*, attaching WEBSTER'S II NEW COLLEGE DICTIONARY 239 (1999) (defining "connect" as "To join or fasten together: unite");  *id.*, attaching THE NEW OXFORD AMERICAN DICTIONARY 364 (Elizabeth J. Jewell et al. eds., 2001) (defining "connect" as "bring together or into contact so that a real or notional link is established").  "Operative" means related to a mechanical or physical activity.  *See* Ex. 5, Sturges Decl. ¶ 22; *see also* Ex. 6, Durbin Decl., attaching AMERICAN HERITAGE at 871 (defining "operative" as "Engaged in, concerned with, or related to physical or mechanical activity"));  *id.*, attaching WEBSTER'S II at 767 (defining "operative" as "Related to, concerned with, or engaged in mechanical or physical activity").  Thus, "operatively connected" has the plain meaning of "mechanically linked or put in contact in a working or effective manner."

SRAM's proposed construction is commensurate with the usage of the term in the '172 patent specification.  For example, the specification discloses that, in one embodiment, a lever **3** works together in conjunction with the axle shaft **13**.  *See, e.g.*, Ex. 1, '172 patent, col. 11, lines 1-16.  In this embodiment, Fig. 3B illustrates how the axle shaft **13** is connected to the lever **3**.  First, the axle shaft **13** is attached to the cam follower shaft **15** using a pin **14**.  *Id.*, col. 10, lines 39–43.  Next, the cam follower shaft is attached to the cam shaft **12**.  *See, e.g.*, *id.*, col. 10, lines 51–54.  Finally, the cam shaft **12** is connected to the lever **3**.  The connections between the axle shaft **13** and the lever **3** allow a rotation of the lever **3** to exert a linear force on the cam housing **4**.  *Id.*, col. 10, lines 49–59; *id.*, col. 10, line 66 – col. 11, line 16.   The connections work to achieve their goal – the cam housing **4** will move inwards when the lever **3** closes, tightening the grip of the axle shaft **13** on the vehicle component **1**.  SRAM's construction is also in accord with the other embodiments discussed in the specification, such as those that use a quick release skewer, as discussed above with regard to the terms "axle" and "cam assembly."  S*ee id.*, col. 10, lines 60–65; *id.*, col. 16, lines 8–18; *see also* Ex. 5, Sturges Decl. ¶ 23.  Accordingly, the axle shaft **13** and the lever **3** are "mechanically linked or put in contact in a working or effective manner."

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA   94111

Shartsis   Friese   LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA   9     4111

FOX's proposed construction is flawed for multiple reasons.  First, the inventors chose to use the word "connected" rather than "affixed."  They knew how to use "affixed," having described an alternative embodiment of the lever stop as comprising "a separate piece that is affixed (e.g. welded) to the relevant part."  Ex. 1, '172 patent, col. 5, lines 13–15; *see also* Ex. 5, Sturges Decl. ¶ 24.  Further, FOX introduces a proposed function to the meaning of "operatively" that is improperly limited to one embodiment in the specification, even though the patents do not state that "operatively" is so limited.  FOX tries to get there by arguing that the inventors criticized the Rose design, but their criticism was not directed towards the <u>connection</u> between the cam assembly and the axle. Ex. 5, Sturges Decl. ¶ 25.  Rather, the critique was limited to certain slots in the Rose axle body and stress risers, and did not disclaim the Rose skewer system as a whole (or even mention the "wedges") that FOX now seeks to criticize.  *See* Ex. 1, '172 patent, col. 2, lines 24–52.  In fact, the inventors expressly stated that a cam skewer of the type shown in the Rose patent could be used as an alternative embodiment of the invention and that "[t]he net result of the cam type mechanism is described herein and operates substantially as such regardless of which specific embodiment is used."  *Id.*, col. 10, line 49 – col. 11, line 1.  Likewise, the inventors discuss that the cam housing 4 "may also be adapted for use on a standard quick release skewer" as shown in other prior art patents incorporated by reference.  *Id.*, col. 16, lines 8–18.  For FOX to suggest that the inventors disclaimed quick release skewers in connection with the cam assembly or operatively connected thereto is misleading, if not disingenuous.

Thus, this Court should reject FOX's attempts to limit the '172 and '009 patent claims to a single embodiment in the specification and adopt SRAM's plain meaning construction.

**E.**    **"*substantial portion of said lever*"**

| Claim Term | SRAM's Construction | FOX's Construction |
|---|---|---|
| "substantial portion of said lever" | "significant or material portion of the lever" | "portion of said lever sufficient to reduce the chance of snagging and accidental release of the lever by contact with landscape during use" |

For the term "substantial portion of said lever," the parties' dispute centers on the meaning of "substantial" in the context of the claims of the '172 and '009 patent, as neither SRAM nor FOX propose a separate construction for "portion of said lever." As a threshold matter, the term "substantial" should have its plain and customary meaning because there are no explicit or implicit definitions given in the specification and there are no disavowals of claim scope. *See, e.g.*, *Hill-Rom Servs., Inc.*, 755 F.3d at 1371.

The Federal Circuit has repeatedly explained that "substantially" (or "substantial") generally has one of two common meanings:  it may "denote[] language of approximation" or "signif[y] language of magnitude, *i.e.*, not insubstantial." *See, e.g., Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1030–31 (Fed. Cir. 2002).  For example, "[t]he phrase 'substantially constant' denotes language of approximation, while the phrase 'substantially below' signifies language of magnitude, i.e., not insubstantial." *Id.* at 1031.

As discussed in the '172 and '009 patents, the term "substantial" does not stand as a term of approximation; in fact, "an approximate portion of said lever" would be nonsensical in the language of the claims. Ex. 5, Sturges Decl. ¶ 26. Rather, "substantial" as modifying the portion of the lever compared to the remainder of the lever is a measure of magnitude, meaning significant or material (*i.e.*, not insubstantial), consistent with its ordinary meaning to one of skill in the art. *See id.* ¶ 27; Ex. 6, Durbin Decl., attaching AMERICAN HERITAGE at 1213 (defining "substantial" as "Of, pertaining to, or having substance; material" and "Considerable in importance, value, degree, amount, or extent"); *id.*, attaching WEBSTER'S II at 1099 (defining "substantial" as "Of, relating to, or having substance: material" and "Being of considerable importance, value, degree, amount, or extent")*.*  Accordingly, the plain and ordinary meaning of "substantial" in the phrase "a substantial portion of said lever" is that the portion of the lever is a material or significant amount of the lever.

Other portions of the specification confirm that the term "substantial" in the context at issue shall mean "significant or material." First, the context of claim 1 is instructive:  "a substantial portion of said lever occupies a position within a recess of an adjacent vehicle component such that a portion less than a whole of said lever protrudes laterally from said vehicle." Ex. 1, '172

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111

1    patent, col. 16, lines 41–44.  Here, "a substantial portion of said lever" is located in the recess but

2    "a portion less than a whole of said lever" is not in that recess.  Accordingly, claim 1 of the '172

3    patent equates "a substantial portion of said lever" with what is left over after "a portion less than

4    a whole of said lever" is taken away from the whole of the lever.  Thus, a "substantial portion" is

5    also a portion less than the whole of the lever.  Ex. 5, Sturges Decl. ¶ 27.  The specification's usage

6    of the term matches SRAM's construction of "a significant or material portion of the lever."

7           The written description states: "In some embodiments, the lever is configured such that

8    when the lever is in the closed position *a substantial portion of the lever* occupies a position

9    within a recess of an adjacent vehicle component *such that a portion less than a whole of the*

10   *lever* extrudes from the vehicle." *Id.*, col. 5, lines 23–27 (emphasis added).  Thus, a material

11   portion that is more than none, but less than all, is a "substantial" portion.  This explicit statement

12   in the written description and claims informs that proper meaning of "substantial portion" in the

13   context of the claims and is consistent with the plain and customary meaning of the term, as well

14   as with SRAM's proposed construction.  *See* Ex. 5, Sturges Decl. ¶ 27.

15          Statements from the inventors of the patent regarding this term support SRAM's proposed

16   construction as well.  For example, when asked what a "substantial portion of said lever occupying

17   a position within a recess of an adjacent vehicle component such that a portion less than a whole

18   of said lever protrudes laterally from said vehicle" means, inventor William Becker stated: "Yes.

19   So, you know, a portion of that lever is inboard of the profile line."  For the following question,

20   Mr. Becker was asked: "Not the whole lever but a part of it, right?"  Mr. Becker responded with

21   "Yes."  *See* Ex. 9, Becker Depo, at p. 207, line 13 – p. 208, line 1.  Additionally, inventor Mario

22   Galasso suggests that when the lever "is somewhat tucked in" front of a vehicle component, that

23   portion of the lever will be a substantial portion.  *See* Ex. 10, Galasso Depo, at p. 215, line 3 –

24   p. 216, line 23.  Thus, in each case, the inventors point only to a portion of the lever when referring

25   to a "substantial portion of said lever."  To the inventors, a "substantial" portion is just a portion

26   that is more than nothing but less than a whole, consistent with SRAM's proposed construction.

27          FOX's proposed construction, on the other hand, is an improper narrowing of the claims

28   to import limitations from the specification.  The specification does not explicitly state any special

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

definition for "substantial," nor is it clear from the specification that the term "substantial" should be given any meaning other than its plain and customary meaning.  Instead, FOX improperly tries to import an ***advantage*** of this "substantial portion" configuration into the claim language, citing col. 5, lines 23–30 and col. 11, lines 22–24, but reciting this purported advantage does not construe "substantial" – instead, it merely states a potential result of this configuration without identifying whether "substantial" is a term of approximation or magnitude.

Moreover, in proffering its construction, FOX introduces other terms like "reduce the chance," "snagging," "accidental release," and "landscape" as ambiguous terms themselves in need of further construction.[7]  Ex. 5, Sturges Decl. ¶ 28. For example, it is ambiguous as to how much of a lever need be recessed to "reduce the chance of snagging and accidental release of the lever by contact with landscape during use."  The specification provides no guidance as to how a reduction in "the chance of snagging and accidental release of the lever by contact with landscape" could be measured.  The specification provides no indication as to what degree the reduction must be for the related portion of the lever to be considered a "substantial portion."  FOX's construction creates more ambiguity than it solves and should be disregarded.  *See Pall Corp.*, 181 F.3d at 1308 (explaining that the goal of claim construction is to "define[] the claim with greater precision than had the patentee," which an ambiguous proposed construction failed to do).

FOX even misleads with respect to the holding of *Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1323 (Fed. Cir. 2003), the principal case FOX relies upon for its proposed construction of "substantially."  FOX asserts that the Federal Circuit "rel[ied] on the operation and benefits recited in the specification to construe 'substantially' in 'portion [of sliding weight] disposed substantially in an imaginary plane.'"  FOX's Brief at 21–22.  Although considering the patent as a whole, the Federal Circuit did not import the operation and benefits recited in the specification into the claim language.  Instead, after considering the

---

[7] Notably, both citations by FOX identify advantages associated with a vehicle having a fork, e.g., a suspension cylinder.  The presence of a "fork" is not a requirement of either claim 1 of the '172 patent or claim 1 of the '009 patent, giving further reason that these purported "advantages" are not required by the claim language "substantial portion."  *See Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008).

Shartsis  Friese  llp
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9    4111

dual common meanings of "substantially" and the intrinsic evidence, the Federal Circuit confirmed "substantially" was a term of magnitude in the context of the patent, construing "substantially" to mean "a not insubstantial portion" of the structure in question intersecting the imaginary plane. *Deering Precision*, 347 F.3d at 1324. FOX cannot reasonably claim that SRAM's construction is unhelpful when it is nearly identical to the construction adopted by the principal case relied upon by FOX.

Based on this evidence, this Court should construe "substantial portion of said lever" to mean "significant or material portion of the lever" in accordance with its meaning as a term of magnitude in the context of the '172 and '009 patents.

F.  **"*substantially unimpeded by an adjacent part of said vehicle*" / "*does not substantially interfere with said adjacent vehicle component when said axle is rotated*"**

| Claim Term | SRAM's Construction | FOX's Construction |
|---|---|---|
| "substantially unimpeded by an adjacent part of said vehicle" | "not significantly or materially hindered or blocked by an adjacent part of the vehicle" | "without the user having to manipulate the lever during one-handed rotation to avoid interference or blockage by an adjacent part of said vehicle" |
| "does not substantially interfere with said adjacent vehicle component when said axle is rotated" | "is not significantly or materially hindered or blocked by an adjacent vehicle component when the axle is rotated" | "does not require the user to manipulate the lever to avoid interference or blockage by an adjacent vehicle component during one-handed rotation of said axle" |

The parties generally do not dispute that the meanings of "interfere" or "unimpeded"; instead, the last two disputed terms likewise turn on the meaning of the term "substantially." SRAM believes this term should be given its ordinary and customary meaning of "significantly or materially," in accordance with its usage as a term of magnitude in the '172 and '009 patents. FOX again seeks to limit this term to a specific embodiment of the patents where the user only uses one hand to turn the lever. Such a narrowing of the plain meaning of "substantially" contravenes well-established and controlling law.

SHARTSIS FRIESE LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA 9  4111

1    As with "substantial," SRAM maintains that "substantially" should be construed according

2    to its ordinary and customary meaning as "significantly or materially." This is consistent with the

3    discussion of "substantial" above, including the plain meaning of the term, its limited usage in the

4    specification, and the understanding of the inventors and those of skill in the art like SRAM's

5    technical expert, Dr. Sturges. *See* Ex. 5, Sturges Decl. ¶ 29. Aside from the claims, the phrase

6    "substantially unimpeded" is used only once in the '172 patent. *See* Ex. 1, '172 patent, col. 5,

7    lines 10–15. The phrase "substantially interfere" is not used outside the claims of the '009 patent.

8    *See* Ex. 2, '009 patent.

9    The inventors of the '172 and '009 patents agree that "substantially" is a term of

10   magnitude. For example, inventor Mario Galasso explains that the amount of impedance required

11   must be more than a small amount to be "substantially impeded." Specifically, he states that where

12   a lever "barely grazes [a vehicle component] so that [the lever] doesn't even scratch the paint,

13   that's probably not substantially impeded." Ex. 10, Galasso Depo., at p. 205, line 19 – p. 206,

14   line 8. Inventor Andrew Laird explained that "does not substantially interfere" means "that the --

15   the lever can be relatively freely rotated when the axle assembly is rotated" and that "relatively

16   freely" means "That when a -- a user is installing or removing his axle assembly and wheel, he or

17   she is not frustrated by the -- the poor design of the -- of the assembly and lower leg." Ex. 11,

18   Laird Depo., at p. 95, line 16 – p. 96, line 6. Thus, these named inventors agree that

19   impeded/interfered means "blocked" and that "substantially" modifies the magnitude of the

20   blockage amount.

21   When construing a given claim, all words in the claim must be given weight. *See Bicon,*

22   *Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006). FOX gives no weight to "substantially"

23   and instead tries to rewrite the claim language to claim a method of operation of the lever and a

24   result of ***no*** interference or blockage, even though the claim language says nothing about the user

25   only using one hand to turn the lever and even though the claim language expressly recites

26   "substantially unimpeded" and "not substantially interfere" as opposed to simply "unimpeded"

27   and "not interfere." FOX's added limitations of "the user," "manipulat[ion] of the lever," and

28

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  9   4111

"one-handed rotation," as well as the avoidance of *any* interference or blockage with an adjacent

vehicle part or component, are well beyond the plain meaning of the term "substantially."

To be sure, the inventors recite the advantage of one-handed rotation for their preferred

embodiment, but this one-handed rotation is not required by the claim language.  Moreover, the

statements in the specification regarding one-handed rotation are tied to the "angle of maximum

rotation" created by the lever stop.  *See* Ex. 1, '172 patent, col. 4, lines 5–15, 29–34; *id.*, col. 11,

lines 32–36.  That angle is specifically identified in claims 1, 2 and 6 of the '172 patent and

claims 1 and 7 of the '009 patent.  Given that the angle of maximum rotation (which limits the

rotation of the lever and helps minimize interference with adjacent vehicle parts) is already set

forth in the claims, it is unclear why FOX interjects "one-handed rotation" into the meaning of

"substantially."

FOX's proposal adds ambiguity because it indicates that the user will not be required to

"manipulate" the lever "during one-handed rotation." Ex. 5, Sturges Decl. ¶ 32.  It is unclear what

criteria would be needed to show, or not show, that a user could or could not "manipulate" the

lever during one-handed rotation.  For example, it is unclear from the context of the claims or the

specification what sort of manipulation would be prohibited or acceptable.  For this additional

reason, FOX's proposal regarding "substantially unimpeded by an adjacent part of said vehicle"

should be rejected.

**V.     CONCLUSION**

As set forth above, this Court should reject FOX's attempts to rewrite the claims of the

'172 and '009 patents and instead adopt SRAM's plain language constructions.

Respectfully submitted,

DATED:  July 6, 2017                          SHARTSIS FRIESE LLP

By:_____*/s/ Erick C. Howard*_____
       Erick C. Howard
       Attorneys for Defendant SRAM, LLC

SHARTSIS  FRIESE  LLP
ONE MARITIME PLAZA
EIGHTEENTH FLOOR
SAN FRANCISCO, CA  94111